THE UNITED STATES, RESPONDENT, v. LORENZO
SNOW, APPELLANT.

VIDE SNOW v. UNITED STATES, 118 U. S., 346.

UNLAWFUL COHABITATION.—EVIDENCE.—The appellant had a legal
    wife and six plural wives all living in the same town in houses
    furnished them by the appellant, who lived in one of the houses
    with his last plural wife; he supported his other wives, occa-
    sionally visited them, attended places of amusement in their
    company, introduced them publicly as his wives and by his lan-
    guage and conduct held them out to the world as such; *held*,
    that he was guilty of the offense of cohabiting with more than
    one woman, created by section 3 of the act of Congress of March
    22, 1882, c. 47, 22 stat. 31.

ID.—OFFENSE, WHEN COMPLETE.—The offense of cohabiting with more
    than one woman is complete, when a man to all outward appear-
    ances lives and associates with two or more woman as wives in the
    habit and repute of marriage, and sexual intercourse is not a
    necessary ingredient of this offense.

INSTRUCTIONS—ORAL CHARGE.—An oral charge should be considered
    as a whole, each part of it as qualified by the other portions, and
    if, when so considered, it is not misleading, it is not erroneous.

ID.—UNLAWFUL COHABITATION.—Certain instructions set out in the
    case, *held*, to have been properly refused.

APPEAL from a judgment of the district court of the first
district, and from an order refusing a new trial.

The appellant requested the trial court to give each of
the following instructions:

2. The term "cohabit" means "live with," or "dwell
with," and in the act under which the defendant is indicted
it means to live with as wives.

3. To constitute "cohabitation" there must be such a
frequency or regularity and manner of association of a
man and woman as to amount to a "living together," and
distinguish the association from mere visits, and so long
as there is not a "living together," occasional visits do not
amount to cohabitation.

4. The defendant, though living with one wife, could
lawfully visit another and her children at reasonable times,

and for lawful purposes; and the purposes of inquiring concerning the health and welfare of such other wife and his children by her, of providing for their support and the education, employment and business of the children, would be lawful. He is not required by law to break off friendly relations with any of his wives, and may attend friendly or social or religious meetings at their houses.

5. Having more than one wife and claiming and introducing more than one woman as wives do not constitute the offense charged. You must find to justify a conviction that he has lived with more than one within the time stated in the indictment.

6. The law assumes the defendant innocent until he is proven guilty beyond a reasonable doubt; and his guilt or innocence is to be determined by you, and what others, or the public may have believed, or had reasons to believe from his manner of living, is not the issue, but you are to say from the evidence whether or not he did in fact live with more than one woman as charged.

7. The defendant was not required to give any notice, public or otherwise, of his manner of life or his purposes, or whether he was or was not abstaining from cohabiting with more than one woman, and it is a sufficient defense if you find from the evidence that it is not shown, beyond a reasonable doubt, that he in fact did live or cohabit with more than one.

8. It is immaterial whether or not there was any change of conduct toward, or of relations with his wives at the time of the passage of .the Edmunds law, if at and prior to that time he was not violating the provisions of the act relating to cohabiting with more than one woman, and if in 1885 he has not so cohabited, he is innocent of the present charge, whether such innocence is the result of a change of relations with his wives, or the result of a maintenance of former relations.

Each of which instructions the court refused to give, to which refusal the appellant excepted.

The other facts sufficiently appear in the opinion of the court.

*Messrs. Bennett, Harkness & Kirkpatrick and Mr. F. S. Richards*, for the appellant.

Cited: *State* v. *Goelz*, 34 Mo., 85; *Coleman* v. *People*, 55 N. Y., 81; *People* v. *Corbin*, 56 N. Y., 363; 1 Bishop Crim. Proc., 1064, 1067; Lawson's Presumptive Ev., 433; *People* v. *Barnes*, 48 Cal., 551; Crim. Prac. Act, sec., 257: *Livingstone* v. *Md. Ins. Co.*, 7 Cranch, 544; *People* v. *Williams*, 17 Cal., 148; *People* v. *Byrnes*, 30 Cal., 207; *Morris* v. *Platt*, 22 Conn., 81; *Teyler* v. *Hillyer*, 26 Am. Dec., 433; *People* v. *Williams*, 17 Cal., 148.

*Mr. W. H. Dickson*, for the respondent.

ZANE, C. J.:

The defendant was convicted of the crime of unlawful cohabitation and sentenced to imprisonment in the penitentiary for the term of six months, and to pay a fine of three hundred dollars and the costs of the prosecution. From this judgment he has appealed to this court, and insists that the evidence is insufficient to justify the verdict.

At the commencement of the trial the defendant admitted before the court and jury that he had married each of the seven women named in the indictment; had not been divorced from either, and that he claimed all of them as his wives and furnished them support.

It appears from the evidence that appellant was first married more than forty years ago in Nauvoo, Illinois, to two women, Adeline and Charlotte, at the same time and by one ceremony (the latter of the two women has since died); and that he has since married in the order named, Sarah, Harriet, Eleanor, Mary, Phœbe, and Minnie, also one other, Caroline, now deceased. The last marriage was in 1871. The first marriage was unlawful because the marriage with two women at the same time is void. Therefore Sarah is the lawful wife. The evidence shows, and it is admitted by defendant, that he has lived and cohabited with the youngest and last wife since his marriage to her,

and that she has four children, the youngest being three months old.

Sarah Snow, the lawful wife, was introduced as a witness without objection, and with other testimony gave the following: She married defendant about forty years ago, and now has grown children by him; she lives at the old homestead in company with Harriet and Eleanor, and has been living there nearly thirty years; five years ago Minnie lived in one wing of the old homestead, and defendant lived with her part of the time; up to the time Minnie came there defendant boarded with witness; she has never been divorced; defendant has supported her; their social intercourse has been friendly, and he calls on her occasionally; he calls less freqently as he grows older.   In answer to the question, "State if it is not about the only difference in your relations in living that he does not call to see you as often as he did formerly?"   Witness stated: "Well, sometimes he calls and sometimes he don't call.   I do not see him as much as I did five years ago, for he lived right there five years ago; he does not visit me as much as he did when he boarded with me.   Five years ago he lived right there, next door."   Witness also said on cross-examination that she has five children; that two live at home, and the youngest is twenty-two years old; that defendant, whenever he goes home, passes by the door—that being one way to go, passing through the lot; that witness went away in the spring of 1885, and that defendant was away six or seven months; that he has called on her two or three times during 1885, and would remain perhaps half an hour; that since defendant moved to the new brick house with his last wife he has never slept in the house where witness has slept, and no room is kept for him; that when he came he would generally be busy with their son; that his calls of late were principally with their son; that he would inquire if they were getting along all right.

Harriet Snow, another wife, stated that she was married to defendant forty years ago, in December of that year; that he is the father of her children, and that she lives in her own home, which appellant provided for her, and that he arranges for her support; that he had visited her a few

times during the year 1885, sometimes to inquire about the children; that she could not say how often he visited her, but he did visit her; witness was asked if there was any difference between their relations during last year (1885) and those of six years ago; to which question she answered "A good deal; in my younger days I lived with him as a wife and raised him children. Now I am an old lady and I do not consider the relations binding upon me in my younger days to be so now. I do not live with him in the same way." Mary Snow also answered the interrogatory; "Is it not true that he has not called as much as he used to, and is not that the only difference?" in the following words: "He does not call so much, for the reason that he has been away from town. He does not visit me as much as he did a number of years ago.." To the further question: "Then the reason he visited you less, was because he was away a great portion of the year?" She answered: "Yes, I guess so; he has been away the last year."

Eleanor Snow, another polygamous wife, among other things stated: "I guess I recognized him as my husband and he me as his wife during 1885; don't know; the difference in our relationship the last year and formerly is he does not live at my place. I guess the only difference is he is not in my company so much—you understand. Previous to that, he had visited and dined with me once in a while. When he dined with me, it was with me and my children, unless there was company to these family gatherings. Mr. Snow occupied the position as head of the family and occupies the head of the table when he is there; his friends all put him at the head of the table."

Dr. J. B. Carrington testified that in 1885 he saw defendant in company with Sarah—out riding with her; another woman was in the carriage—thought it was Harriet; that he also saw defendant and Sarah sitting together in the theatre, in the part of the house usually occupied by the Snow family, and that they afterwards went out together. In the city where defendant lives he and his various wives and their families appear from the

evidence to be regarded by all as one family, and this family has a place assigned it in the theatre apart from other people; that each wife and her family are regarded as a part and portion of defendant's family—of the Snow family—and that the appellant is regarded as the head of this entire family by each member of it. In 1885 the last witness saw defendant go in and come out through the gate in front of the old homestead, where Sarah and two of his polygamous wives lived, but witness did not see him go in or come out of that house. The officer who arrested appellant testified that after he had searched defendant's house he discovered a carpet that had been ripped, and on examination found underneath the carpet a little trap door, and under that door a small apartment, and back of that another apartment, and in that apartment he found the defendant. Defendant did not come out when called, until the officer made preparation to break the door; defendant then said: "All right; I am coming out," and when he came out he said further: "That is all right, boys; you have done your duty; come and take a drink with me."

It appears from the evidence that appellant boards and lodges with his last wife, and visits his other wives occasionally, though not very often; that during the year 1885 he has not lodged or taken a meal with any one of the others; that he furnishes them houses to live in, and supports them; that he introduces them publicly as his wives, and by his language and conduct holds them out to the world as such. The evidence proved beyond controversy that defendant cohabits with his polygamous wife Minnie. The remaining fact to find from the evidence is, Has he at any time during the year 1885 cohabited with the other women named in the indictment, or any one of them? It appears from the evidence that defendant is seventy-two years old, and has married nine wives, and that seven of those wives are still living. To the first he was married in his youth. As his passion for one wife became satiated, and dulled by indulgence and gratification, and as his lust was again kindled by the appearance of a younger and fresher, or possibly a more attractive

woman, he would marry again until his marriages have been repeated nine times, and now, at the age of seventy-two years, he is found with seven living wives—the last being comparatively young, with an infant in her arms. He furnishes homes for, supports, associates with, claims, holds out, and flaunts in the face of society all these seven women as his wives. And yet he says he cohabits with but one. The law must characterize his relation to them, and his intercourse and association with them. Let us consider the case with respect to Sarah, his lawful wife.

A lawful marriage of itself affords a strong presumption of matrimonial cohabitation, because such cohabitation is in accordance with duty and usually attends such a marriage. When to this presumption are added the further inferences from the following facts: that defendant claimed Sarah all the time as his wife, and that she claims to be such; that he provides for her a home, and the necessaries and comforts of life; that they were on good terms; that he took her to the theatre, out riding, visited her occasionally at her home, and was the father of her children—the conclusion removes every reasonable doubt that he cohabited with her as his wife. When they were associating together she was not his paramour or his friend simply—he then had and still has all the rights and opportunities of a husband, and she those of a wife. They were living together. Under such circumstances the law will not permit them to say they were together merely as friends, and not as husband and wife.

It is not essential to matrimonial cohabitation that the parties should be together all the time if their intercourse and relations are agreeable and they associate together some part of the time. In that case the law does not notice the intervals of separation. Owing to the necessities of human life, and the claims of business and trade, married people are often in each other's company less for long periods than the defendant and his wife Sarah were during the year 1885, and yet they are regarded as cohabiting as man and wife. Such is often the case with mariners, traveling salesmen, and other classes of per-

sons that could be mentioned.   They associate at long in-
tervals, and are regarded as cohabiting.

The third section of the Act of Congress of March 22,
1882, was intended to reach such conduct as the evidence
proves the defendant guilty of: "If any male person   .   .
.   .   cohabits with more than one woman, he shall be
deemed guilty of a misdemeanor," etc.   When the entire
act, of which the above quotation is a part, is taken and
considered together in the light of the occasion and neces-
sity of its enactment, and of the evil it was intended to
remedy, we are of the opinion that the term "cohabit"
should be given a broad meaning.   In construing the term,
regard should be had to the spirit and general intent of the
act.   "It is an established rule in the exposition of statutes
that the intention of the law-giver is to be deduced from
a view of the whole and every part of a statute, taken and
compared together.   When the words of a statute are not
explicit, the intention is to be collected from the context—
from the occasion and necessity of the law, from the mis-
chief felt, and the object and remedy in view; and the in-
tention is to be taken or presumed according to what is
consonant to reason and good discretion."   This was the
rule laid down by Plowden, pp. 10, 57, 205, 363, and by
these maxims Chancellor Kent affirms "the sages of the
law have ever been guided in searching for the intention
of the legislature," and commends them "as maxims of
sound interpretation, which have been accumulated by the
experience and ratified by the approbation of ages:" 1
Kent's Com., 462; Potter's Dwarris on Statutes and Con-
stitutions, 196, note 13.

In construing the term "cohabitation," as used in the
act under consideration, the supreme court of the United
States say, in the case of *United States* v. *Cannon*, 116
U. S., 55. "It is the practice of unlawful cohabitation
with more than one woman that is aimed at—a cohabita-
tion classed with polygamy and having its outward sem-
blance.   It is not, on the one hand, meretricious unmarital
intercourse with more than one woman.   General legisla-
tion as to lewd practices is left to the territorial govern-
ment; nor, on the other hand, does the statute pry into the

intimacies of the marriage relation. But it seeks not only to punish bigamy and polygamy, when direct proof of the existence of those relations can be made, but to prevent a man from flaunting in the face of the world the ostentation and opportunities of a bigamous household with all the outward appearances of the continuance of the same relations which existed before the act was passed, and without reference to what may occur in the privacy of those relations."

This court, speaking by Boreman, J., said: "What then was the object of the Congress in enacting this statute? It was, judging from the whole act, intended to be an aid in breaking up polygamy and the pretense thereof:" *United States* v. *Cannon,* ante p. 122. The opinion of this court in case of *United States* v. *Musser,* ante p. 153, is to the same effect: "It appears plain that the intention was to protect the monogamous marriage, by prohibiting all other marriage, either in form or in appearance only, whether evidenced by a ceremony, or by conduct and circumstances alone. . . . . The end of the law was the protection of the monogamous marriage, and the suppression of polygamy and unlawful cohabitation were but means to that end. It is proper also to take into consideration the conditions as the national legislature anticipated and understood them—in which the law was to be applied and enforced. They knew the time had elapsed within which a very large portion of those living in polygamy could be punished for that offense, and that many of these were among the most influential men in society, being the heads of the church: and that the example of their continuing to live with their plural wives under a claim of divine right would be a scandal to society and a menace to the lawful marriage; that such examples would be a continuing invitation and an apparent justification for their followers, either secretly or openly, to violate the law. Congress, therefore, forbade plural marriage in appearance only, as well as in form, and by the example of punishment it doubtless intended to eradicate the example of apparent plural marriages, as well as the plural marriage in form."

The evidence against the defendant shows one of the

most aggravated cases and worst examples of polygamy. He has one lawful and six plural wives living, and all of them he maintains and publicly acknowledges by introducing them as such; but claims that he is cohabiting with but one and visiting the others when he pleases. We are of the opinion that the evidence was sufficient to justify the verdict.

The defendant excepted to certain parts of the charge given in the lower court, and assigns the giving thereof to the jury as error. The charge appears to have been an oral one, and does not consist of separate instructions. Each part of it should be regarded as qualified by the other portions. If the paragraphs excepted to were not misleading when so considered, they should not be regarded as erroneous. The portion first excepted to is, "It is not necessary that the evidence should show that the defendant and these women, or either of them, occupied the same bed, slept in the same room, or dwelt under the same roof; neither is it necessary that the evidence should show that within the time mentioned in the indictment the defendant had sexual intercourse with either of them." This was a statement of facts not necessary to be shown by the evidence, and was immediately followed by a statement of essential facts, as follows: "The question is, Were they living in the habit and repute of marriage? The offense of cohabitation is complete when a man, to all outward appearances, is living and associating with two or more women as wives. When the portion of the charge objected to is taken with that which immediately followed, the jury must have understood that if the defendant and any two of his wives were living in the habit and repute of marriage, and to all outward appearance they were living and associating together as man and wife, it was not necessary to show that they occupied the same bed, slept in the same room, dwelt under the same roof, or that they were guilty of sexual intercourse.

The jury must have understood that it was necessary for them to believe from the evidence that the defendant, and at least two of his wives lived and associated together as man and wife to all outward appearances, and that it was

not necessary that he should board and lodge under the same roof with, or have sexual intercourse with, them. If they so understood they were not mislead.

Counsel for appellant also assign as error the giving of the following as a part of the charge: "The question is, Were they living in the habit and repute of marriage? The offense of cohabitation is complete when a man, to all outward appearances, is living or associating with two or more women as wives. If the conduct of defendant has been such as to lead to the belief that the parties were living as husband and wife live, then the defendant is guilty." This paragraph must be considered with the one in which the jurors were instructed that they must be satisfied of the defendant's guilt beyond a reasonable doubt before they could convict.

The defendant also excepted to the following clause of the charge, and assigned the giving thereof as error: "Of course, the defendant might visit his children by the various women, he may make directions regarding their welfare, he may meet the women on terms of social equality; but if he associates with them as a husband with his wife he is guilty. The Edmunds law says there must be an end of the relationship previously existing between polygamists. It says the relationship must cease." So much of the clause as stated that defendant might visit his children, make directions regarding their welfare, and might meet his wives on terms of social equality, was quite as favorable to the defendant as he could ask; and the further statement, "but if he associated with them as a husband with his wife he is guilty," was a rather meager statement of what had been stated more fully in the preceding part of the charge. The remark that "the Edmunds law says there must be an end of the relationship previously existing between polygamists," and that "it says that the relationship must cease," was evidently made inadvertently. It was a disconnected affirmation, intended to be a declaration of the general intent and purpose of the law known as the Edmunds law. As a statement of the purpose of the law it was correct. That act was doubtless aimed at polygamy, and intended to put an end

to it. The statement could not be understood as a definition of the crime of unlawful cohabitation. And the jury could not have so understood it. That offense had been fully described in the preceding portion of the charge. We do not believe that this statement of the purpose of the law misled the jury, and, therefore, it is not ground for reversal.

We are of the opinion that the exceptions of the defendant to the ruling of the trial court in admitting and refusing evidence are not well taken.

The action of the court in refusing certain requests asked by the defendant is also assigned as error.

The second, third, and fifth of them related to the definition of the term "cohabitation," as used in the law which the defendant was charged with violating. That term was defined in the charge with sufficient clearness to enable the jury to understand its meaning in view of the evidence. In the fourth request certain conduct was mentioned that would not constitute the offense, and the request was not necessary to be given.

The sixth request was given, in substance, in the charge, so far as it was proper. And we are of the opinion that the seventh and eighth requests referred to matters in regard to which it was unnecessary to charge the jury. The charge, as given, covers all the points upon which it was necessary to instruct the jury, and was quite full, and substantially correct.

After a careful examination of this record we find no ground sufficient to reverse the judgment of the district court, and it is therefore affirmed.

POWERS, J., and BOREMAN, J., concurred.